[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These parties were married on September 26, 1981. One party has resided in the State of Connecticut continuously for more than one year prior to the commencement of this action. There have been two minor children born to the wife since the date of the action:
 Raymond Thomas Ayoub, II, born August 22, 1986 Amanda Ayoub, born October 4, 1988.
No other minor children have been born to the wife since the date of the action. The parties have not been recipients of public assistance. The court finds that the marriage between the parties has broken down irretrievably and there is no reasonable hope of its reconciliation. CT Page 5618
The plaintiff, in her claims for relief, seeks sole custody of the minor children. Further, she seeks to remain in the marital home 148 Sentimel Hill Road, North Haven with the minor children. She seeks child support in accordance with the Child Support Guidelines, alimony and settlement of assets and liabilities in accordance with the claims for relief. The defendant seeks joint legal custody and shared physical custody of the minor children. His claims for relief detail the schedule sought. He seeks that the marital home be sold with the inclusion of an order granting the right to purchase Mrs. Ayoub's equity interest in the property. He offers child support to be paid pursuant to the guidelines. The parties differ regarding their income reporting for the guideline calculation. Mr. Ayoub is seeking alimony from Mrs. Ayoub, as she is from him. He as, well, seeks orders regarding the settlement of the marital estate.
The minor children have been represented throughout this proceeding by Attorney Christensen. He submitted his invoice with a net due of $2,475.06. The reasonableness of these charges is conceded by the parties. Allocation of payment is in dispute. The children have assets in custodial accounts. However, the value of these accounts has not been placed before this court. They had original balances of $12,000 each. Present balance(s) is unknown.
The plaintiff is 39 years old. She has a Bachelor's Degree in nursing attained before the marriage. She is a registered nurse by training and vocation. While her health is presently good she has recently suffered health problems. A benign growth has recently been removed from her head above one of her eyebrows. She also was in an auto accident this past year. While she sustained some injury, none have been lasting or permanent. She is employed as a registered nurse with St. Raphael's Hospital she works an evening shift for 24 to 28 hours per week. She has worked mainly on this schedule since February, 1990. Previously, since the birth of the children, she has worked exclusively in the home as a homemaker. Her present hourly rate is $20.00 per hour. Mrs. Ayoub is physically capable of working full time (40 hours per week) at St. Raphael's. No day shifts for that work are available. She does not desire to expand her hours because of the time it would consume that she now directs to the care of the two minor children and her homemaking responsibilities. She remains in the marital home with the children.
The defendant is 42 years old he has a Bachelor's Degree earned before marriage. He is in good health, although he has some CT Page 5619 health limitations described hereafter. He has throughout the marriage been employed as a stockbroker. He has at more recent employment with Coburn and Meredith worked on a commission only basis. His income for 1997 was $38,482.91; for 1996 it was $40,631.79 and for 1995 was $29,299.30. Mr. Ayoub believes his earning potential as a stockbroker has been stymied because in part he has lost a major client in the past year, and experienced a steady low in business due (he believes) to the ability to trade stock privately on the Internet. At the very conclusion of the defendant's direct testimony on the last day of trial, his testimony disclosed that he had just accepted a new position as an insurance agent with Med Span (in Hartford) to begin in one week. His sales territory will be in the New Haven County Area. His expected salary is $35,000 per year with promise of incentive pay for productivity. He expected to earn an additional $1,000 per month based on this productivity provision.
Mr. Ayoub has, from about 1995 through July, 1997 earned additional income with a side business known as Best Built. Through this business he earned income building playscapes, decks and closet organizers. Most of the work was done on weekends, and occasionally evenings while the parties lived together. The business belonged to The Barter Network which is a market for commerce where compensation is payable to vendors in barter dollars. These barter dollars are useful to purchase other products and services provided by member vendors. The defendant has not continued his involvement with this enterprise since July, 1997. He explains this cessation by pointing out that on the weekend time he previously utilized, the children are with him. Further, he complains of some physical disability in the shoulder impairing this physically demanding work.
Ironically, as the plaintiff seeks to attribute this Best-Built work as additional earning capacity to the defendant, the defendant seeks to attribute a schedule of full-time hours to the earning capacity of the plaintiff. Each party challenges the other's assertions because of their responsibilities as parents. The court finds that the plaintiff's and defendant's present earnings should be the foundation of support/financial orders. The court does not find it in the children's best interest for the plaintiff to expand her hours to full time based on the present available hours and the difficult emotional state of the children. Realistically, while some time may be available for Mr. Ayoub to do side work, his decision 9 months ago to abandon it cannot be challenged. He works full time and his choice to be CT Page 5620 available for his children otherwise is not inappropriate. The only uncertainty, then, is the regularity and amount of incentive earnings to be earned by the defendant at MedSpan. Because of their indefiniteness and a lack of a track record, child support orders relating to that incentive income portion of the defendant's earnings will necessarily deviate from the guidelines.
Early in the marriage, the parties lived in Massachusetts, buying their first home there. Ultimately, they sold that and relocated to Connecticut in the New Haven area for a new employment opportunity for the defendant. The parties purchased their present home. Their two children were born. While the plaintiff was home with the children, the parties (to the extent of the defendant's availability) shared parenting responsibility. As time went by, the parties increasingly experienced financial problems. The plaintiff started work at St. Raphael's as a way to relieve some of the financial pressures on the parties. She maintained her earnings in a separate account with which she bought family clothing, food, gifts, miscellany, vacations, her transportation needs and related expenses. The defendant continued to utilize his earnings for shelter costs for the family. The court finds both parties applied their earnings towards family endeavors. The financial woes continued. As financial problems festered, the parties marriage became strained and uncomfortable. The defendant became increasingly involved in his computer, seeking refuge in its "chat rooms". The plaintiff sought nurturance from neighbors and other friends. Ultimately, they became estranged in their interpersonal relationship, failing to talk, listen or nurture each other. The plaintiff engaged in an extra-marital infidelity with a neighbor on March 16, 1996. The defendant violated the plaintiff's feelings and trust by derogatorily speaking of her in his chat rooms seeking the distant, abstract support of communicants. Both parties contributed to the ultimate demise of their marriage. Their conduct toward each other after that is far more demonstrative of their real persona, however, and as a predictor of their future dealings with each other. Both are essential to understand, of course, as part of a determination of appropriate custodial orders.
The parties children are Raymond, 11 years old and Alexandra 9 years old. They have both been severely and adversely affected by these proceedings. They are no longer, the happy carefree children reported a few years ago. Alexandra suffers some and CT Page 5621 Raymond mightily. He exhibits extraordinary hostility and behavioral problems. From the evidence, the court finds that the defendant has consistently engaged the children in this matter, enlisting them in his venture on for joint legal custody and shared physical custody and in a campaign of undermining their love, trust and respect for their mother. While she is not without faults or weaknesses as laid out before this court, the childrens' knowledge of all of this is harmful to them, and to no good purpose or end ultimately. The court finds that responsibility for this is with the defendant.
The plaintiff is essentially a caring but insecure person. Her needs for affection and nurturance had caused her to make her relationship with Mark St. Hollaire a priority at a most inopportune time for her children. It makes no sense for children entwined in a conflict such as this to have to deal with Mr. St. Hollaire's overnight presence in their home. They do not see this relationship through an adult prism. It is far too confusing and threatening to them. Weighed against such a poor choice are many positive parenting attributes of the plaintiff. She has not sought to undermine the defendant in his relationship with the children. She has furthered it. She has been supportive of the defendant in speaking with the children regarding his forging a new post-marital life. She has been communicative with the defendant sharing necessary and important day-to-day information with him about the children. She has been flexible in scheduling. She has attempted to work with professional care givers for Raymond in addressing his emotional difficulties. By all accounts, she is a supportive, consistent and secure parent for Raymond and Alexandra.
Mr. Ayoub has behaved entirely inappropriately regarding these children through the proceeding. He apparently has been unaware that his conduct in ventilation of his anger toward his wife will inevitably adversely affect his children. After finding out about his wife's affair with a neighbor, Mr. Ayoub visited all the neighborhood households to publicize this indiscretion. Many of the children's friends are in the neighborhood. On another occasion, he spilled bleach on the home lawn to spell out S-L-U-T in large letters burned by the bleach into the lawn. He has consistently discussed custodial arrangements with the children, specifically Raymond. He has been violent and threatening toward Mrs. Ayoub on more than one occasion. His conduct has been around and in the presence of the children. This is inexcusable: it undermines the security and well-being of the CT Page 5622 children. Mr. Ayoub would have this court believe that he has gained insight into the misappropriateness of his behavior and has learned as a result of his counseling and from his mistakes. This court does not believe Mr. Ayoub. He desires joint legal custody and yet he remains unwilling to acknowledge that Mrs. Ayoub is a good mother. He tells us that he has forgiven Mrs. Ayoub for her mistakes and hopes that she will forgive him for that mistakes she believes he has made. This does not constitute any growth or maturity as Mr. Ayoub would plead with the court to find has occurred.
Counsel for the minor children has informed the court of his clients' stated desire for their parents to have joint legal custody and shared physical custody. C.G.S. § 446-56(b)(17). Notwithstanding their stated desire, the court rules to the contrary. Utilization of this jargon, in itself, by children of their ages conclusively indicates that they have been overly involved and entwined in this conflict by their parents.
Family services performed an evaluation. Their report and the examination of its author was also before the court (C.G.S. § 466-5 and 466-7).
The conflict between their parents has adversely affected the children. The court cannot find that joint legal custody can work for these children Connecticut General Statutes Section 46b-56a(b). There is no reason to recall the details of countless events precipitated by Mr. Ayoub that have jeopardized the children (nasty notes, disparaging remarks, events requiring police confrontations, etc.). They are all in the evidence and never explained or rationalized with any credibility by Mr. Ayoub. Even with the scrutiny of a court proceeding, Mr. Ayoub has been unable to function as a co-decision maker with Mrs. Ayoub. He has criticized her and intimidated her. The court specifically finds that joint legal custody is not in the best interest of the children. In structuring the children's time of access with their father, the court has considered the best interests of the children. This includes the past pattern of contact, the evidence, and, also, specifically the expected work schedule of the parties.
In the consideration of orders for the disposition of the marital estate, the court further finds the following facts: Mr. Ayoub filed personal bankruptcy in November, 1996, six months before this action commenced. In his bankruptcy filing, he valued all the personal property/furnishings at the home at $1,000 (furniture/furnishings). Now, the defendant seeks an order CT Page 5623 dividing the home furnishings, attaching values to the furnishings in the hundreds and thousands of dollars for each of the many items. On his financial affidavit he relates a total value of $45,000.00. The defendant cannot have it both ways. He gave an oath as to the values state in his bankruptcy petition. Now having received a discharge in bankruptcy, he wants this court to find him credible that he should have an equitable share of these items. He lacks credibility. His hands are unclean. The real estate at 148 Sentimel Hill Road is found by the court to have a fair market value of $175,000.00.
The real estate is titled in Mrs. Ayoub's name alone. The mortgage balances disclosed on the parties financial affidavits include an obligation to Mr. Ayoub's mother, which has a balance of $28,000.
Mrs. Ayoub has a 401k plan through work. Its value is found by the court to be $6,100. She also has a defined benefit plan, which the parties agree can be divided in half. The second mortgage on the house, in the balance of about $30,000.00 was taken out so that defendant could start a business. That never occurred. The funds were spent anyway. While plaintiff is not aware of where the money has gone. There is no evidence that defendant misappropriated it. Mr. Ayoub has 35,000 shares of First Agate Corp. He claims that it has no value. The court finds it has no value. Mr. Ayoub has been discharged in bankruptcy from $127,400.00 in unsecured liabilities. The plaintiff, Mrs. Ayoub is jointly liable on an obligation to New Haven Savings Bank, as a co-signer on a checking account that had overdraft protection. That debt with accrued interest is approximately $6,000 as of the date of trial. It results, at last in part from Mr. Ayoub's withdrawals from the account. As to the balances of each parties' debts, they are each as listed on their respective financial affidavits. Neither is legally liable on the debts of the other. The parties' mortgage went into foreclosure pendent lite. It was reinstated after other ordered payments were made. The allocation of those payments is before this court and evidence was received. The court finds that the plaintiff was remiss in keeping the mortgage current and had the ability to do so.
The court finds that the income of the defendant, without consideration to incentive bonus, at MedSpan, is $35,000/year or $673.09/week. As single, with one dependency exemption, his weekly federal tax withholding is estimated to be $100.00 per week (Dept. Treasury, IRS, Circular E). His social security and medicare taxes will be withheld at about 7.5% or $50.00 per week. CT Page 5624 His net is, then, estimated (accounting for state tax) to be approximately $523.00 per week. The plaintiff's net, for child support purposes is $439.00 per week. (There is no breakdown of allocation of medical insurance premiums provided to the court.) The parties combined net weekly income is $962.00 weekly. The basic child support obligation is $316.00 weekly. The plaintiff's proportionate share is 46% and the defendant's 54%, or $171.00 per week. This, of course, does not account for the bonus income.
In fashioning the property settlement orders, the court (among other factors) shall consider the causes for the dissolution of marriage. "The criteria for the assignment of property pursuant to General Statutes § 46b-81(c) and the ordering of alimony pursuant to General Statutes § 46b-82 are virtual identical. While an action for divorce or dissolution of marriage is a creature of statute it is essentially equitable in its nature. Stoner v. Stoner, 163 Conn. 345, 346, 307 A.2d 146
(1972). Pasquariello v. Pasquariello, 168 Conn. 579, 584,362 A.2d 835 (1975)." Sunbury v. Sunbury, 210 Conn. 170, 173-174,553 A.2d 612 (1989).
After careful consideration of the statutory criteria regarding dissolution of marriage, custody and visitation issue, alimony, property settlement and the award of counsel fees the court makes the following orders:
1. The court dissolves the marriage between the parties.
 2. Sole custody of the minor children is ordered in the plaintiff mother.
The defendant father shall have visitation with the minor children on the following schedule:
1. Alternating weekends (beginning with the next weekend that Mrs. Ayoub is working and the following two weekends) at 10:00 a.m. Saturday to Monday morning school, and when school is not in session to no lather than 10:00 a.m. on Monday.
2. On the Monday (after the intervening weekend, when Mrs. Ayoub has not been working) after school to Wednesday morning to school. When school is not in session this schedule shall be Monday at 2:00 p. m. to Wednesday at 9:00 p. m. This provision of alternating Monday to Wednesday at 9:00 a.m. is contingent upon Mr. Ayoub moving to the Wallingford/North Haven area before the CT Page 5625 start of the next school year for the ease of the children. If he fails to do so, then commencing the start of school, Fall, 1998, his visitation shall be Monday 3 p. m. to 8 p. m. on this alternating week.
3. The parties shall alternate legal holidays annually each year. Christmas shall be shared as follows: Christmas Eve to 9 p. m. is Mr. Ayoub's time with the children.
4. Mother's Day is always Mrs. Ayoub's time with the children and Father's Day is always Mr. Ayoub's time with the children.
5. Each party shall have one full week of uninterrupted vacation time with the children in the summer.
6. The defendant shall pay child support, by immediate wage withholding, to the plaintiff as follows;
a. $171.00 per week, and,
b. 25% of all gross bonuses and incentive payments.
7. The defendant shall pay periodic alimony to the plaintiff in the amount of $60.00 per week until the first occurrence of May 31, 2007 or either party's death, the plaintiff's remarriage or her cohabiting with an unrelated male as defined by our law and statute. No alimony is ordered to the defendant.
9. The plaintiff is the sole owner of the real estate at 148 Sentinel Hill Road, North Haven and its contents free of any claim of the defendant. Any personal belongings or tools of his that the plaintiff, in her sole discretion, desires to give him may be accomplished.
10. The defendant shall be solely responsible for the New Haven Savings Bank obligation. He shall indemnify and hold the plaintiff harmless on the same.
11. By qualified domestic relations order (to be drafted by defendant, at his expense), the defendant is ordered one-half of the plaintiff's interest in the defined benefit plan with St. Raphael's valued as of May 6, 1998.
12. The parties shall each be responsible for their respective debts. CT Page 5626
13. The plaintiff shall pay the first and second mortgages on the marital home.
14. The minor children's legal fees shall be paid from their own funds in equal shares. The defendant shall pay any shortfall within six (6) months.
15. The plaintiff shall be the sole owner of her 401k plan.
16. Each party shall pay their own legal fees.
17. The plaintiff shall maintain health insurance for the minor children as it is available to her through employment at reasonable cost. The parties shall each pay one-half of the health expenditures of the children not paid by the insurance. Defendant shall pay his share to plaintiff within 15 days of presentation of the bill.
18. The defendant and plaintiff shall each maintain life insurance as available through their employment for the benefit of the minor children.
19. Tax laws shall apply to the allocation of dependency exemptions.
20. As lump sum alimony (and in lieu of claim for repayment of mortgage foreclosure expenses) the defendant shall pay to the plaintiff the sum of $3,400.00 within 120 days.
21. Each party is title owner to any and all other property in their respective possession at this time.
Munroe, J.